UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
MICELI CONTRACTING CO., INC.,
PATRICK J MICELI, and BARBARA
M. MICELI,

                                **REPORT AND**
                                **RECOMMENDATION**
            Plaintiffs,           CV 24–5923 (JS)(AYS)

        -against-

JP MORGAN CHASE BANK N.A.,
BANK OF AMERICA, N.A., MODEL
GLOWUP LLC, NATASHA MY
FAVORITE, and WATCHMAXX,

                       Defendants.
--------------------------------------------------X
**SHIELDS, Magistrate Judge,**

Plaintiffs Miceli Contracting Co., Inc. ("MCC"), Patrick J. Miceli ("Mr. Miceli"), and

Barbara M. Miceli. ("Mrs. Miceli") (collectively the "Plaintiffs"), commenced this action against

JPMorgan Chase Bank, N.A. ("Chase"), Bank of America, N.A. ("BOA") (collectively the

"Defendants"), as well as three other Defendants, alleging negligence against all of the

Defendants, as well as gross negligence, unjust enrichment, and money had and received against

BOA.

Presently before this Court, upon referral by the Honorable Joanna Seybert for Report

and Recommendation, (see Electronic Order dated 04/04/2025), are Chase's and BOA's motions

to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (See

Docket Entry ("DE") [16] and [20].) As discussed below, this Court respectfully recommends

that Defendants' motions be granted.

BACKGROUND

I.    Documents Considered

As is required in the context of this motion to dismiss, the factual allegations in the Amended Complaint, though disputed by the Defendant, are accepted to be true for purposes of this motion, and all reasonable inferences are drawn therefrom in favor of the Plaintiffs.

While facts to consider in the context of a Rule 12 motion to dismiss are generally limited to those set forth in the pleadings, a court may consider matters outside of the pleadings under certain circumstances. Specifically, in the context of a Rule 12(b)(6) motion, a court may consider: (1) documents attached to the Complaint as exhibits or incorporated by reference therein; (2) matters of which judicial notice may be taken; or (3) documents upon the terms and effects of which the Complaint "relies heavily" and which are, thus, rendered "integral" to the Complaint." Chambers v. Time Warner, Inc., 282 F.3d 147, 152-153 (2d Cir. 2002); see Int'l Audiotext Network, Inc. v. Am. Tel. and Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995). Moreover. "[a] court may take judicial notice of documents filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Glob. Network Commc'ns, Inc. v. City of New York, 458 F.3d 150, 157 (2d Cir. 2006) (quoting Int'l Star Class Yacht Racing Ass'n Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998)).

The Court turns now to discuss the facts set forth in Plaintiffs' Complaint, construed in their favor.

II.    Facts

    A.    Background

    1.    The Parties

Plaintiff MCC is a New York Corporation with its principal place in New York. (Compl., DE [1-1], ¶ 3.) Plaintiffs Mr. and Mrs. Miceli are New York residents. (Id. ¶ 4.) Chase is a bank with its principal place of business in New York. (Id. ¶ 5.) BOA is a bank with its principal place of business in North Carolina. (Id. ¶ 6.)

    2.   <u>Chase</u>

    a.   <u>The Accounts and Wire Transfers</u>

Plaintiffs allege that they maintain two Chase accounts. (Compl. ¶ 13.) One account is a Chase Total Business Checking account in the name of MCC ending in 9327 (the "Business Account"). (Id. ¶ 13; <u>see</u> <u>also</u> <u>id.</u> Ex. B at 39-49.) The other is Mr. Miceli and Mrs. Miceli's joint Chase Total Checking personal account ending in 6618 (the "Personal Account") (collectively with the Business Account, the "Accounts"). (Id. ¶ 13; <u>see</u> <u>also</u> <u>id.</u> Ex. C at 53-58.) When opening the Business Account on June 8, 2016, Mr. Miceli signed a Signature Card, and was thus, an authorized signer on the account. (Declaration of Sylvia E. Simson ("Simson Decl."), DE [18], ¶ 2; <u>id.</u> Ex. 1, DE [18-1].) Mrs. Miceli was later added as a joint authorized signer on the Business Account when she and Mr. Miceli signed a Business Account Add Form on March 2, 2022. (Id.) Mr. Miceli signed a Signature Card for the Personal Account on June 23, 2016. (Id. Ex. 2.) Mrs. Miceli was later added a s joint holder of the Personal Account when she and Mr. Miceli both signed a Signature Card electronically on November 4, 2022. (Id. Ex. 2.)

Plaintiffs claim that Mr. Miceli personally sent four Wire Transfers from the Accounts but was tricked into doing so by unnamed third parties. (Compl. ¶¶ 17-19.) Plaintiffs allege that on January 12, 2024, Mr. Miceli was contacted by these third parties who purported to be Chase's fraud department. (Id. Ex. E at 61-65.) During this call, these third parties attempted to access the Accounts. (Id.) To verify that Mr. Miceli himself was accessing the Accounts, Chase

sent him one-time passcodes by text message to his own mobile device. (Id.) Mr. Miceli bypassed Chases' security measures by voluntarily giving the passcodes to the unnamed third parties who were attempting to deceive him. (Id.)

The unnamed third parties told Mr. Miceli that "someone in Orlando, Florida" stole his identity and made certain transfers from his Accounts. (Compl., Ex. E at 65.) They then told him that in order to "get [his] money back," Mr. Miceli "has to login to [his] mobile app" with Chase and send certain wire transfers to various accounts held at BOA. (Id.) Mr. Miceli complied with these instructions and sent the outgoing Wire transfers from the Chase Accounts himself, admitting that a "fraudster . . . [c]onvinced [him] to create wires[.]" (Id. Ex. 1 at 102.) Mr. Miceli initiated three Wire Transfers from the Accounts on January 12, 2024, totaling $85,000. (Id. ¶¶ 17-18.)

After discovering that he was deceived, Mr. Miceli contacted Chase, (Compl. ¶ 20,) who then asked BOA to reverse the Wire Transfers and sent hold harmless letters (the "HHLs") in which Chase agreed to indemnify BOA on connection with its return of the funds. (Id. ¶¶ 23-24.) In May 2024, BOA returned approximately $30,000 of the funds transferred via the Wire Transfers to Chase, and Chase then credited the Accounts in that same amount. (Id. ¶¶ 30-31.)

      b.    <u>The DAA and DSA and the Online Wire Transfer Addendum</u>

When signing the Signature Cards, Plaintiffs agreed to be bound by the DAA with Chase, all of which state that Plaintiffs "acknowledge[d] receipt of the Bank's Deposit Account Agreement . . . , which include[s] all provisions that apply to this deposit account . . . and agree[d] to be bound by the terms and conditions contained therein as may be amended from time to time." (Simson Decl. Ex. 1 at 1; Ex. 2 at 1, 9.)

The version of the DAA in effect when the Wire Transfers occurred provided that the DAA "governs your account" and "[w]hether you have a personal or business deposit account, this document is the basic agreement between you and us[.]") (Simson Decl. Ex. 3, DE [18-3], at 5.) The DAA also states that Chase "may subtract from your available balance the amount of any check or other transaction that we receive throughout the day that you or any person you authorize created or approved." (Id. at 14.) The DAA further provided that Chase "will not be liable for anything [it does] when following your instructions." (Id. at 22.)

Plaintiffs also agreed to be bound by Chase's Digital Services Agreement (the "DSA") and its addenda, including the Online Wire Transfer and Chase Global Transfers Services Addendum (the "Wire Transfer Addendum"). (Simson Decl. Ex. 4, DE [18-4].) The Wire Transfer Addendum governs the use of online wire transfer services, (see id. at 79-86,) and begins with a section advising customers how to "Protect Yourself Against Wire Scams." (Id.) The Wire Transfer Addendum cautioned Plaintiffs to "[**b**]e aware of wire scams, because once the wire is sent, you may not be able to recover your money." (Id. at 80 (bold in original).) Among the "signs of a scam: that Chase describes in the Wire Transfer Addendum is where a requestor "[c]ontacts you unexpectedly[,]" "[c]laims there is an emergency[,]" and "[p]ressures you into paying immediately . . . ." (Id.) Chase further stressed that "[y]ou should not discuss or disclose your online user ID and Password, your one-time code, or any other information that we may use to confirm your identity with any person regardless if they have access to your accounts." (Id. at 81.) Plaintiffs agreed they "acknowledge that [Chase] offer[s] funds transfer services in person at [its] branches that provide a higher level of security for [their] accounts, and [they] can use this option instead." (Id.) The Wire Transfer Addendum also states that the accountholder "acknowledge[s that] the security procedures for FTS [Funds Transfer Services,

including wire transfers] are a commercially reasonable method of verifying your funds transfer" and that the accountholder themselves is "responsible for any funds transfer issued in [their] name using thee security procedures, whether or not [they] actually authorized the transfer." (Id.)

Further by agreeing to the Wire Transfer Addendum to the DSA, Plaintiffs consented to the terms below concerning Chase's processing of wire transfers:

> Processing: We'll Start processing your funds transfer the same Business day if we receive it and complete our security procedures before the cutoff times we establish . . . .

> Canceling: [O]nce you have submitted a funds transfer for the current Business Day, you cannot cancel it after we've begun processing, but you may request us to attempt to return the funds to you. If the recipient's bank agrees, your funds may be returned to you, but likely not the full amount that was originally sent . . . .

> Modifying: Once a funds transfer has begun processing, we will not be able to change any type of funds transfer requests unless the recipient's bank agrees. If the recipient's bank declines to change the funds transfer request, you will be responsible for the transfer you initially requested.

(Simson Decl. Ex. 4 at 81-82.) Finally, Plaintiffs agreed to Chase's liability waiver in the Wire Transfer Addendum, which states:

> [Chase is} only responsible for performing the services specified in this Agreement. Except as otherwise agreed in writing, we are liable only for damages requires to be paid as provided under UCC 4A or, to the extent applicable Regulation E, subpart B. . . . [W]e will not be responsible for the acts or omissions of any other person or entity . . . . IN NO EVENT SHALL WE HAVE ANY LIABILITY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, PUNITIVE, OR SPECIAL DAMAGES, EVEN IF ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

(Id. at 84 (capitalization in original).)

3.    BOA

On January 12, 2024, Mr. Miceli initiated three wire transfers from Plaintiffs' Chase accounts. (Compl. ¶¶ 17-19.)  The first wire transfer in the amount of $21,000 was transferred from Plaintiffs' Chase account to a BOA account maintained by co-defendant, Natasha My

Favorite ("NMF"). (Id. ¶ 17 (the "First Wire Transfer").) The second wire transfer in the amount of $19,000 was transferred from Plaintiffs' Chase account to a BOA account maintained by NMF (the "Second Wire Transfer). (Id. ¶ 17.) The third wire transfer in the amount of $45,000 was transferred from Plaintiffs' Chase account to a BOA account maintained by co-defendant Model Glow Up (the "Third Wire Transfer). (Id. ¶ 18.)

On January 26, 2024, a fourth wire transfer totaling $174,239 was transferred from Plaintiffs' Chase account to a BOA account maintained by co-defendant Watchmaxx (the "Fourth Wire Transfer" and collectively with the First Wire Transfer, Second Wire Transfer, and Third Wire Transfer, the "Wire Transfers"). (Compl. ¶ 19.)

BOA froze the Model Glow Up, NMF, and Watchmaxx accounts after being notified by Plaintiffs that the Wire Transfers were fraudulent. (Compl. ¶ 19.) BOA advised that it required s hold harmless letter before considering returning the remaining funds in the relevant accounts to the Plaintiffs. (Id. ¶ 21.) Plaintiffs allege that Chase forwarded a hold harmless agreement regarding the Wire Transfers to BOA on January 29, 2024. (Id. ¶¶ 23-24.) On May 10, 2024, BOA returned $701.24 to an account maintained by Mr. Miceli at Chase. (Id. ¶ 30.) On May 24, 2024, BOA returned $28,347.39 to an account maintained by Mr. Miceli at Chase. (Id. ¶ 31.) Plaintiffs allege that the FBI informed them that the funds from the Fourth Wire Transfer was given to another victim of the fraudsters. (Id. ¶ 35.)

B.    Procedural History

Plaintiffs commenced this action on July 17, 2024, in the Supreme Court of the State of New York, Suffolk County.  (See generally Compl.)  On August 23, 2024, BOA removed this matter to the Eastern District of New York on diversity jurisdiction grounds. (DE [1].) Chase and BOA then filed pre-motion letters requesting leave to move to dismiss, to which Plaintiffs did

not respond. (DE [12], [13].) On October 3, 2024, the District Court waived its pre-motion conference requirement an issued a briefing schedule for Defendants' motions to dismiss. (See Electronic Order dated 10/03/2024.) The instant motions were filed on December 18, 2024. (DE [16], [20].) On April 4, 2025, the motion were referred to the undersigned for a Report and Recommendation. (See Order Referring Motions dated 04/04/2025.)

III.    The Motions to Dismiss

Defendants seek dismissal of the Complaint pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure.

Chase argues that Plaintiffs' single cause of action against Chase for negligence, is preempted by the New York Uniform Commercial Code ("NYUCC"). Chase claims that Article 4-A of the NYUCC governs wire transfers generally, as well as the specific Wire Transfers at issue in this case. Further, Chase argues that even if the negligence claims is not preempted, that the agreements between Chase and Plaintiffs preclude any finding of liability against Chase.

Similarly to Chase, BOA asserts that Plaintiffs' three tort claims against them for negligence, gross negligence, and joint cause of action for money had and received, unjust enrichment, and restitution are preempted by Article 4A of the Uniform Commercial Code ("UCC"). BOA also argues that Plaintiffs' tort claims are barred by New York's adverse claims statute. BOA also maintains that they owe no duty of care to the Plaintiffs and as such Plaintiffs' causes of action for negligence and gross negligence fail as a matter of law. Finally, BOA avers that Plaintiffs cannot alleges that BOA received funds for its benefit no can Plaintiffs allege that BOA failed to comply with its obligations under the UCC Article 4A, therefore, Plaintiffs' joint cause of action for money had and received, unjust enrichment, and restitution fails as a a matter of law.

The Court now turns to the merits of the motions.

DISCUSSION

I.    <u>Legal Principles: Standards Applicable on Motions to Dismiss</u>

A.    <u>Rule 12(b)(6)</u>

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678-79 (2009) (quoting, <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)); <u>see</u> <u>also</u> <u>Arista Records, LLC v. Doe 3</u>, 604 F.3d 110, 119–20 (2d Cir. 2010). Facial plausibility is established by pleading sufficient factual content to allow a court to reasonably infer the defendant's liability. <u>Twombly</u>, 550 U.S. at 556. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> at 555. Nor is a pleading that offers nothing more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," sufficient. <u>Iqbal</u>, 556 U.S. at 678 (2009) (quoting <u>Twombly</u>, 550 U.S. at 555).

With these standards in mind, the Court turns to assess the viability of Plaintiffs' claims.

II.    <u>Failure to State a Claim</u>

Defendants argue that Plaintiffs' common law claims for negligence and gross negligence should be dismissed because they are preempted by Article 4-A of the New York Uniform Commercial Code ("U.C.C."). The gravamen of Defendant Chase's motion is that Chase complied with its obligations under the U.C.C. when it faithfully executed the wire instructions authorized by Plaintiff and, as such, Defendant cannot be liable for following Plaintiff's instructions. Defendant BOA asserts that as the beneficiary bank. Its acceptance of a payment from a receiving bank does not create any obligations between BOA and the Plaintiffs. As such,

BOA argues that because BOA complied with the law, the UCC provides no avenue for relief against a beneficiary bank and the senders (Plaintiffs), as it would produce a result inconsistent with the UCC.

### A.    Chase

### i.    Extrinsic Material

Prior to discussing the substance of Chase' motion, the Court must first determine whether the extrinsic materials Chase submitted in support of its motion are cognizable at this stage of the litigation. In reviewing a motion to dismiss, a court "may consider documents that are attached to the complaint, incorporated in it by reference, integral to the complaint, or the proper subject of judicial notice." United States v. Strock, 982 F.3d 51, 63 (2d Cir. 2020). "To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents and to be integral to a complaint, the plaintiff must have (1) actual notice of the extraneous information and (2) relied upon the documents in framing the complaint." Benny v. City of Long Beach, No. 20-cv-1908, 2021 WL 4340789, at *10 (E.D.N.Y. Sept. 23, 2021). The extrinsic materials Chase asks the Court to consider are the DAA, DSA, and Wire Transfer Addendum, that Plaintiffs agreed to, before the wire transfers at issue were executed. (Simson Decl. Ex. 1 at 1; Ex. 2 at 1, 9; Simson Decl. Ex. 3, at 5; Simson Decl. Ex. 4.)

While Plaintiffs do not explicitly reference these documents in the Complaint, there is no question that these documents are "integral to the complaint" because the transactions at issue here would not have occurred but for Plaintiffs' execution of those documents. See Strock, 982 F.3d at 63. Moreover, Plaintiffs do not challenge the authenticity of those documents, nor do they challenge that they are the agreements that control the wire transfers at issue in the Complaint. Not only is there no challenge to the centrality of these documents to the Complaint,

but Plaintiffs' opposition brief surprisingly fails to address in any fashion Defendant's argument

that the claims are barred by these agreements. Accordingly, the Court will consider the DSA.

DAA and Wire Transfer Addendum in analyzing Chase's motion.

    ii.    <u>The Negligence Claim Against Chase Is Precluded by the Agreements</u>

As noted above, Plaintiffs are silent about the effect of the Agreements on their claim

against Chase and have therefore waived any argument in opposition to Chase's motion in this

regard. <u>See, e.g.</u>, <u>Azeez v. City of New York</u>, No. 16-cv-342, 2018 WL 4017580, at *6

(E.D.N.Y. Aug. 22, 2018) ("Ordinarily, any issues not addressed in an opposition brief are

deemed abandoned by the party opposing the motion."); <u>Flanagan v. Girl Scouts of Suffolk</u>

<u>Cnty., Inc.</u>, No. 21-cv-7513, 2023 WL 6594885, at *8 (E.D.N.Y. Aug. 25, 2023) (holding that

plaintiff's failure to address an argument in opposition to defendants' motion to dismiss

"amounts to a concession of th[e] argument"). Notwithstanding this procedural forfeiture, the

Court agrees with Chase that the agreements control here and that there is no question that Chase

complied with the terms of the agreements and cannot be liable for how it executed Plaintiffs'

instructions to wire funds to BOA. The agreements are also clear that Chase begins to process

the wire transfer request on the same business day the request is received, and that a request

cannot be cancelled after that processing begins. (Simson Decl. Ex. 4 at 81-82.)

Because there is no question that Chase complied fully with the terms of the Agreements,

and Plaintiffs concede as much, Plaintiffs are bound by their contractual obligations and cannot

do an end run around those agreements by concocting a duty of care that does not exist here. <u>See</u>,

<u>e.g.</u>, <u>Serengeti Express, LLC v. JP Morgan Chase Bank, N.A.</u>, No. 19-cv-5487, 2020 WL

2216661, at *5 (S.D.N.Y. May 7, 2020) (holding that even if a party were able to establish the

elements of a tort, that party could not "overcome a contractual limitation on liability" in a

deposit account agreement to which both parties agreed); ReAmerica, S.A. v. Wells Fargo Bank Int'l, No. 04-cv-5233, 2008 WL 7811571, at *4 (S.D.N.Y. Mar. 18, 2008), aff'd, 577 F.3d 102 (2d Cir. 2009) (enforcing the provisions of a wire transfer agreement executed by the plaintiff); Perlberger Law Associates, P.C. v. Wells Fargo Bank, N.A., No. 21-cv-2287, 2022 WL 2819136, at *6 (E.D. Pa. July 19, 2022) (finding that the wire transfer agreement "governed the terms of the parties' relationship").

Although Plaintiffs fail to address the contract arguments, they appear generally to argue that they are not challenging the way Chase executed the wire transfers. In an effort to bypass the strictures of the contracts, and the U.C.C., Plaintiffs concede that they would be precluded from bringing this action if the allegation was based solely on the "fund transfers." (Pls.' Chase Opp., DE [19], at 5.) Instead, they argue that because Chase created a duty of care when Chase attempted to recover the funds from BOA via the HHLs. (Id.) In effect, what Plaintiffs are really arguing is that Chase had an extra-contractual duty to cancel/recover the wire transfers belatedly once it was informed by Plaintiffs that they had been the victim of a fraud. Plaintiffs, however, fail to cite any authority that supports the position that a bank has a duty to somehow recoup funds for the benefit of a sender customer where there was no effort by that customer timely to cancel a duly authorized wire transfer and where, as here, there is no allegation that Chase had the authority to seize funds that were otherwise properly deposited in the accounts of the wire transfer beneficiaries.

As noted in Jajate v. JPMorgan Chase Bank, N.A., Plaintiffs are asking the Court to find

that a bank that receives an authorized wire transfer instruction and follows that instruction precisely, but learns a month later from the customer that he had been tricked by a third-party to wire the funds, can be liable for executing the instructions. Such a farfetched standard would toss bank payment systems into chaos because the risk of loss from Plaintiff's own actions (or inactions) would be unreasonably shifted to the bank. That is not what the contracts here provide for,

and, as discussed below, is certainly not what the drafters of the U.C.C. had in mind when they drafted Article 4-A.

711 F. Supp. 3d 169, 175 (E.D.N.Y. 2024).

B.     Overview of U.C.C. Article 4-A

"Article 4-A of the U.C.C. governs the procedures, rights, and liabilities arising out of commercial electronic funds transfers." Grain Traders, Inc. v. Citibank, N.A., 160 F.3d 97, 100 (2d Cir. 1998). Because "attempts to define rights and obligations in funds transfers by general principles or by analogy to rights and obligations in negotiable instrument law or the law of check collection have not been satisfactory," Article 4-A was adopted. U.C.C. § 4-A-102, Official Cmt. Notably, the drafters of Article 4-A "use[d] precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles." U.C.C. § 4-A-102, Official Cmt.

The precision employed by the drafters is reflected in the definitions provided in Article 4-A. See id. §§ 4-A-103–105. A "payment order" is defined as "an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing, to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary." Id. § 4-A-103(1)(a). In turn, a "sender" is defined as "the person giving the instruction to the receiving bank," id. § 4-A-103(1)(e), and the "receiving bank" is defined as "the bank to which sender's instruction is addressed," id. § 4-A-103(1)(d). A "customer," however, is defined as "a person, including a bank, having an account with a bank or from whom a bank has agreed to receive payment orders." Id. § 4-A-105(1)(c). Which party bears the risk of loss for a fraudulent wire transfer is also determined by Article 4-A. Section 4-A-204(1)(a) provides that "[i]f a receiving bank accepts a payment order issued in the name of its customer as sender which is [ ] not authorized and not effective as the order of the customer under Section 4-A-202 ... the bank shall refund any

13

payment of the payment order received from the customer." U.C.C. § 4-A-201(a). Therefore, for the bank's refund obligations to be triggered under Section 4-A-204(1)(a), the payment order must be neither authorized nor effective. If the payment order is authorized or effective, the bank bears no refund obligation.

       i.     <u>The U.C.C. Precludes Plaintiffs' Negligence Claim Against Chase</u>

Here, as noted above, there is no question that Plaintiffs authorized the wire transfers. Moreover, as alleged in the Complaint, there is no question that: (i) Plaintiffs are the "sender" of the "payment order" and a "customer" of Chase; (ii) Chase is the "receiving bank" of that order; (iii) Model Glow Up, NMF, and Watchmaxx are each a "beneficiary" of an authorized "payment order"; and (iv) BOA is the "beneficiary bank" for those payment orders because Model Glow Up, NMF, and Watchmaxx held accounts at BOA. Plaintiff does not dispute that this was the structure of the wire transfers. Instead, they argue that, because the wire transfers were authorized, the fact that the Chase fulfilled its obligations under the NYUCC is not relevant here. The Court disagrees. In effect, Plaintiffs are arguing that because Chase faithfully executed the authorized wire instructions it should be held to a higher standard than what the U.C.C. requires, because it should have diligently attempted to cancel/recover the funds to the beneficiaries of those accounts after learning of the fraud against the Plaintiffs. This argument finds no support in the law.

Chase contends that the sole claims asserted against it for negligence, is preempted by Article 4-A. Because Article 4-A sets forth who bears the loss when an authorized transaction is made that the sender later attempts to rescind, the provisions "represent a careful and delicate balancing of [competing] interests and are intended to be the exclusive means of determining the rights, duties, and liabilities of the affected parties in any situation covered by particular

provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article." U.C.C. § 4-A-102, Official Cmt.

The Second Circuit has interpreted this language to "preclude common law claims when such claims would impose liability inconsistent with the rights and liabilities expressly created by Article 4-A." Grain Traders, 160 F.3d at 103. However, not all common law claims "are per se inconsistent with this regime." Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 597 F.3d 84, 89 (2d Cir. 2010). In evaluating whether a claim is preempted "[t]he critical inquiry is whether the provisions protect against the type of underlying injury or misconduct alleged in a claim." Id. at 89–90. Courts in this Circuit have decided that claims were preempted at the motion to dismiss stage. See, e.g., Banco del Austro, S.A. v. Wells Fargo Bank, N.A., 215 F. Supp. 3d 302, 306 (S.D.N.Y. 2016) (granting defendant's motion to dismiss plaintiff's negligence claim because the claim was precluded by U.C.C. Article 4-A); 123RF LLC v. HSBC Bank USA, N.A., 663 F.Supp.3d 391, 399–403 (S.D.N.Y. 2023) (finding at the motion to dismiss stage that a plaintiff's negligence, gross negligence, and breach of contract claims were preempted by U.C.C. Article 4-A).

Consistent with these principles, the negligence and gross negligence claims here are preempted by Article 4-A. Indeed, even in situations more egregious than here, for example where a bank honored an unauthorized wire transfer, courts in this Circuit have found that claims that defendant "violated its duty of care by negligently honoring" unauthorized transfers, "fall[ ] entirely within the coverage of [Article 4-A], which creates a comprehensive risk allocation for unauthorized funds transfers," and are thus preempted. Banco del Austro, 215 F. Supp. 3d at 306–307; see also Frank Calandra, Jr. Irrevocable Tr. v. Signature Bank Corp., 816 F. Supp. 2d

222, 236 (S.D.N.Y. 2011) (finding that plaintiff's breach of contract and gross negligence claims were preempted by U.C.C. Article 4-A in a case where a former trustee was able to misappropriate funds from a trust, in part because the bank's conduct was arguably inconsistent with its own know-your-client policies). That reasoning applies with equal, if not greater, force here where there is no allegation that Chase did anything improper, such as accepting an unauthorized payment order, in how it executed the wire transfers.

Plaintiffs attempt to argue around this reasoning by claiming that they are not challenging the propriety of how Chase handled the execution of the wire transfers themselves, and therefore are not claiming that the wire transfers were unauthorized. Instead, Plaintiffs claims that Chase's misconduct lies in its failure to timely cancel/recover the funds from BOA after being put on notice of the alleged third-party fraud, after the funds had been transferred. But this is simply another way of saying that Chase should have canceled the wire transfers upon learning of the fraud by recovering the wire amounts from BOA in order to revert to the status quo ante. This is no different than had Plaintiffs attempted to cancel the transactions on the day after Chase had begun to process the orders. In other words, Plaintiffs are complaining about conduct that is squarely within the ambit of Article 4-A. See, e.g., Fischer & Mandell LLP v. Citibank, N.A., No. 09-cv-6916, 2010 WL 2484205, at *7–*8 (S.D.N.Y. May 27, 2010), aff'd, 632 F.3d 793 (2d Cir. 2011) (finding that a negligence claim brought by a plaintiff who authorized a wire transfer and then attempted to cancel it after learning that the check providing the funds for the transfer was forged, was preempted by Article 4-A); Phil & Kathy's v. Safra Nat. Bank of New York, 595 F. Supp. 2d 330, 332–33 (S.D.N.Y. 2009) (holding that claims brought by a plaintiff who authorized two wire transfers to an account at defendant bank before arguing that one of the orders should have been cancelled, were preempted by Article 4-A). To hold otherwise would

have the effect of creating a "buyer's remorse" basis for cancellation of wire transfers at any time after execution, which would be inconsistent with the goals of Article 4-A because it would lead to tremendous uncertainty by undermining the finality of financial transactions. As the New York Court of Appeals has observed, the New York U.C.C. "has the objective of promoting certainty and predictability in commercial transactions." Putnam Rolling Ladder Co. v. Mfrs. Hanover Trust Co., 74 N.Y.2d 340, 349, 547 N.Y.S.2d 611, 546 N.E.2d 904 (1989) (noting as well that "the UCC not only guides commercial behavior but also increases certainty in the marketplace and efficiency in dispute resolution").

Accordingly, this Court respectfully recommends that Chase's motion to dismiss be granted.

ii.   The U.C.C. Precludes Plaintiffs' Claims of Negligence and Gross Negligence Against BOA

As explained supra, BOA as the beneficiary bank of the Wire Transfers, was legally obligated to deposit the funds from the Wire Transfers into its customers' accounts. U.C.C. § 4-A-404. BOA was required to make the funds available to their customers upon the acceptance of the payment orders or subject itself to "consequential damages as a result of nonpayment." Id. BOA simply followed the instructions in the Wire Transfers, followed its obligations under the law, and credited the funds to the beneficiaries' accounts specified in the payment orders.

BOA's acceptance of a payment order from a receiving bank, does not create any obligations between the beneficiary bank and the senders. U.C.C. § 4-A-209, cmt. 4. Acceptance of a payment order only creates an obligation between the beneficiary bank and the beneficiary. Id. Plaintiffs' attempts to bypass the comprehensive body of law governing wire transfers under Article 4A and assert common law claims against BOA as beneficiary bank is clearly inconsistent with the UCC and preempted. See, e.g., Grain Traders, 160 F. 3d at 102 (Article

4A's privity limitation "allows each sender of a payment order to seek refund only from the receiving bank it paid"). Under the UCC Article 4A, only the receiving bank that transmits the payment order to the beneficiary bank has standing to assert a claim against the beneficiary bank; the originator does not have standing. See Frankel-Ross v. Congregation OHR Hatalmud, 2016 WL 4939074, at *3 (S.D.N.Y. Sept. 12, 2016) (dismissing Article 4A claim for lack of privity); Wellton Int'l Express v. Bank of China (Hong King), 612 F. Supp. 3d 358, 364 (S.D.N.Y. 2020) (Article 4A "incorporates a privity requirement , , , so that the remedy applies only between the parties to a particular payment order and not to the parties to the funds transfer as a whole.") (citations and quotations marks omitted)). Accordingly, as Plaintiffs are not customers of BOA, they lack standing under Article 4A. Further, if Plaintiffs were BOA customers, therefore overcoming the privity hurdle, their claims of negligence and gross negligence would still be preempted by the UCC, as the conduct they complain of, namely that authorized wire transfers were not canceled/recovered after being put on notice that the sender's were victims of fraud, falls squarely under Article 4A of the UCC.

As against Chase, Plaintiffs similarly attempt to argue around this reasoning by claiming that they are not challenging the propriety of how BOA handled the execution of the wire transfers themselves, and therefore are not claiming that the wire transfers were unauthorized. Instead, Plaintiffs claims that BOA's misconduct is that after being notified that the senders were victims of fraud, BOA only distributed some back to Plaintiffs and released the other funds to the stated beneficiaries of the authorized Wire Transfers. As with Chase, this is simply another way of saying that BOA should have canceled the wire transfers upon learning of the fraud by sending the wire amounts back to the Chase accounts. This is inconsistent with Article 4A. See Jajati, 711 F. Supp. 3d at 177 (rejecting the same argument and holding that conduct complained

about "is squarely with the ambit of Article 4-A."); <u>see also</u> <u>Grain Traders</u>, 160 F. 3d at 102

("Any common law claim that would impose liability on Citibank for failing to cancel BCN's

payment order is precluded as inconsistent with Article 4-A"); <u>Shecter Landscaping, Inc. v. JP</u>

<u>Morgan Chase Bank NA</u>, 614 F. Supp. 3d 553, 559 (E.D. Mich. 2022) (holding that Article 4A

displaced common law claims alleging that the beneficiary bank failed to freeze or recover funds

from the beneficiary account after being notified if the fraud.).

Accordingly, Plaintiffs' common law claims of negligence and gross negligence are

preempted by the UCC.

C.    <u>BOA Lacks Any Special Relationship With Plaintiffs and Owes No Duty To Them</u>

New York Law recognizes an exception to the general rule that banks don't owe duties to

non-customers if the plaintiff can establish that (1) a fiduciary relationship exists between the

customer and non-customer, (2) the bank knows or should know of such relationship, and (3) the

bank has actual knowledge of the customer's misappropriation. <u>See</u> <u>Targoff v. Wells Fargo Bank,</u>

<u>N.A.</u>, 67 Misc. 3d 504, 122 N.Y.S. 493, 498 (N.Y. Sup. Ct. 2020). Since Plaintiffs do not allege

any of the above conditions, the proposed exception is inapplicable.

Plaintiffs generally contend that because BOA returned a portion of money after being

notified of the fraud. This "created a special relationship between the Plaintiffs and [BOA] from

which a duty of care arose." (Pls'. Opp., DE [25], at 5, 7.)  Plaintiffs attempt to lend support for

their theory by relying on a case decided pursuant to New Jersey law, <u>Ben-Dor v. Alchemy</u>

<u>Consultant LLC</u>, 229 Ad.3d 405, 407, 215 N.Y.S. 3d 323, 325 (2024), as the basis for finding a

special relationship between themselves and BOA. The <u>Ben-Dor</u> decision bears no relevance

here. Made under New Jersey law, the <u>Ben-Dor</u> decision, found that a special relationship could

potentially exist in some circumstances between a bank and its customer. The Court expressly

limited its holding in that it "applies only to bank customers." Id. at 408. As Plaintiffs are not BOA customers, and New Jersey law is not applicable, the argument is meritless. No special relationship exists between Plaintiffs and BOA. Thus, BOA owes no duty to them.

> D.   Plaintiffs' Claim Against BOA For Money Had And Received, Unjust Enrichment, and Restitution Fail As A Matter of Law

Plaintiffs combine their causes of action for money had and received, unjust enrichment and restitution into their third cause of action; presumably because all three claims mirror the same elements. "To prevail on a claim for unjust enrichment in New York, a plaintiff must establish: (1) defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the circumstances were such that equity and good conscience require defendant[ ] to make restitution." Hughes v. Ester C Co., 930 F. Supp. 2d 439, 471 (E.D.N.Y. 2013) (internal quotation marks and citations omitted)). "The essential elements in a claim for money had and received under New York law are that (1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n, 731 F.2d 112, 125 (2d Cir.1984). "Under New York law, 'claims for unjust enrichment and money had and received are identical.'" Story v. SEFCU, 18-CV-0764, 2019 WL 2369878, at *5 (N.D.N.Y. June 5, 2019)  (quoting J.C. Penney Corp. v. Carousel Ctr. Co., L.P., 635 F. Supp. 2d 126, 129, n.1 (N.D.N.Y. 2008); Almazan v. Almazan, 14-CV-0311, 2015 WL 500176, at *14 (S.D.N.Y. Feb. 4, 2015) (finding the plaintiffs' claim for money had and received "survive[d] for the same reasons" as their unjust enrichment claim); Maxus Leasing Grp. v. Kobelco Am., Inc., 04-CV-0518, 2007 WL 655779, at *5, n. 15 (N.D.N.Y. Feb. 26, 2007). Thus, the following discussion focuses on the unjust enrichment claim, but its conclusion applies to all three claims.

When considering an unjust enrichment claim, a court's "essential inquiry" is one of "equity and good conscience." Paramount Film Distrib. Corp. v. State, 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 285 N.E.2d 695 (1972). Though these are "broad considerations," id., the New York courts have applied them consistently in cases involving "gratuitous donee[s]" or "[i]nnocent parties." Simonds v. Simonds, 45 N.Y.2d 233, 242, 408 N.Y.S.2d 359, 380 N.E.2d 189 (1978). In those cases, New York courts have required proof that the innocent party received a "specific and direct benefit" from the property sought to be recovered, not an "indirect benefit." Kaye v. Grossman, 202 F.3d 611, 616 (2d Cir.2000). The direct-indirect distinction is consistent with a separate line of unjust enrichment cases in New York holding that a plaintiff's relationship with the defendant cannot be "too attenuated." See Sperry v. Crompton Corp., 8 N.Y.3d 204, 216, 831 N.Y.S.2d 760, 863 N.E.2d 1012 (2007) (concluding that "the connection between the purchaser of tires and the producers of chemicals used in the rubber-making process is simply too attenuated to support" an unjust enrichment claim). Both sets of cases demonstrate that courts are cautious about extending unjust enrichment liability beyond the principals to the transaction, and that when they do so, it is possible as a matter of equity to draw a clear line between the plaintiff's loss and the defendant's gain or misconduct. See Paramount, 30 N.Y.2d at 421, 334 N.Y.S.2d 388, 285 N.E.2d 695 ("Generally, courts will look to see if a benefit has been conferred on the defendant under mistake of fact or law, if the benefit still remains with the defendant, if there has been otherwise a change of position by the defendant, and whether the defendant's conduct was tortious or fraudulent.").

Sufficient proof that an innocent party specifically and directly benefitted requires more than a showing that the innocent party may have had access to, or some awareness of, the funds in question. "[O]n a theory of unjust enrichment, there must first be enrichment." Indyk v. Habib

Bank Ltd., 694 F.2d 54, 57 (2d Cir.1982); see also Jaffe v. Capital One Bank, 2010 WL 691639 (S.D.N.Y. Mar. 1, 2010) (noting "[t]he absence of an allegation that Defendants *tangibly* benefitted at Jaffe's expense") (emphasis added). Thus, in Zell & Ettinger v. Berglas, the Second Department held that a husband was not unjustly enriched simply because he had access to his wife's misappropriated funds in the couple's joint bank account. 261 A.D.2d 613, 690 N.Y.S.2d 721 (1999).

Here, Plaintiffs have failed to assert that money or a benefit was conferred onto BOA. The Complaint is devoid of any allegation that BOA utilized the funds at its discretion, placed the funds in its own escrow account, or took any personal actions in regards to the funds which benefited BOA.

Second, the Complaint fails to allege or identify what benefit BOA actually obtained by receiving the funds from the Wire Transfers. Plaintiffs' sole response to BOA's motion to dismiss is "[BOA] received the transfers to accounts at their institutions" and it received a benefit by having "a significant amount of money interjected into its portfolio." (Pls.' Opp. at 7.) See e.g., Curry Mgmt. Corp. v, JP Morgan Chase Bank, N.A., 2022 WL 17342495, at *6 (S.D.N.Y. Nov. 30, 2022) (dismissing money had and received claim where plaintiff failed to allege defendant bank benefitted from the transaction.).

Lastly, equity and good conscience do not require a bank to absorb the loss or damages created by fraudulent actors. OneWest Bank, FSB v. Deutsche Bank Nat'l Tr. Co., 186 A.D.3d 92, 101, 127 N.Y.S.3d 97, 104 (2020) (confirming that when a loss is created by a fraudster or thief the bank involved has no obligation in 'equity and good conscience to absorb the loss").

As Plaintiffs' allegations are conclusory at best, Plaintiffs' claims are insufficient to state a claim pursuant to Rule 12(b)(6). Accordingly, this Court respectfully recommends that BOA's

motion to dismiss Plaintiffs' third cause of action for money had and received, unjust enrichment and restitution be granted.

III.   Leave To Amend

Although the Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6)," the Court declines to recommend that Plaintiffs be granted leave to amend. Noto v. 22nd Century Grp., Inc., 35 F.4th 95, 107 (2d Cir. 2022) (affirming denial of leave to amend). "A court should freely give leave when justice so requires, but it may, in its discretion, deny leave to amend for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." MSP Recovery Claims, Series LLC v. Hereford Ins. Co., 66 F.4th 77, 90 (2d Cir. 2023) (affirming denial of leave to amend). "Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure." In re Tribune Co. Fraudulent Conv. Litig., 10 F.4th 147, 175 (2d Cir. 2021) (affirming denial of leave to amend).

As an initial matter, granting Plaintiffs leave to amend at this stage in the proceedings would unduly prejudice Defendants. Defendants filed pre-motion letters that previewed for Plaintiffs the grounds on which they intended to move to dismiss the Complaint. Plaintiffs failed to file any opposition, nor did they indicate any wish to amend the Complaint. Plaintiffs simply failed to respond. Thereafter, the Court issued a scheduling order for briefing the motions to dismiss.

Beyond the undue prejudice to the Defendants, leave to amend would be futile because, even if Plaintiffs could amend to add claims under the U.C.C. or another theory of law, those claims would fail for the reasons set forth above. Additionally, given the concessions already

23

made in the Complaint and the opposition briefs about the manner in which the transfers were executed, and the fact that the transfers were authorized, even if Plaintiffs were able to allege new facts about the execution of the transfers, any such allegations would, for the reasons noted above, be insufficient to survive a motion to dismiss.

<u>CONCLUSION</u>

For the foregoing reasons, this Court respectfully recommends Chase's motion to dismiss, found at docket entry No. 16 herein, and BOA's motion to dismiss, found at docket entry No. 20 herein, be granted. The Court further recommends that Plaintiffs be denied leave to amend.

<u>OBJECTIONS</u>

A copy of this Report and Recommendation is being provided to all counsel via ECF.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of filing of this report.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b).  Any requests for an extension of time for filing objections must be directed to the District Judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections.  Failure to file objections within fourteen (14) days will preclude further review of this report and recommendation either by the District Court or Court of Appeals. <u>Thomas v. Arn</u>, 474 U.S. 140, 145 (1985) ("[A] party shall file objections with the district court or else waive right to appeal."); <u>Caidor v. Onondaga Cnty.</u>, 517 F.3d 601, 604 (2d Cir. 2008) ("[F]ailure to

object timely to a magistrate's report operates as a waiver of any further judicial review of the

magistrate's decision").

Dated:  Central Islip, New York
        August 19, 2025

                                                    /s/ Anne Y. Shields
                                                    Anne Y. Shields
                                                    United States Magistrate Judge